**HOTEL EMPLOYEES, RESTAURANT EMPLOYEES UNION, LOCAL 2,**
Plaintiffs–Appellants,

and

**AFL–CIO, Plaintiff,**

v.

**MARRIOTT CORPORATION,**
Defendant–Appellee.

**HOTEL EMPLOYEES, RESTAURANT EMPLOYEES UNION, LOCAL 2,**
Plaintiffs–Appellants,

v.

**MARRIOTT CORPORATION,**
Defendant–Appellee.

Nos. 90–15023, 90–15571.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 15, 1991.

Decided April 24, 1992.

Matthew D. Ross, Leonard, Carder, Nathan, Zuckerman, Ross, Chin & Remar, San Francisco, Cal., for plaintiffs-appellants.

James C. Paras, Morrison & Foerster, San Francisco, Cal., for defendant-appellee.

Before: BROWNING, FARRIS and LEAVY, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

The San Francisco Redevelopment Agency (the Agency) is charged with finding private developers for certain publicly owned properties. In late 1980, the Agency solicited proposals for the development of a major luxury hotel. At public hearings, Hotel Employees, Restaurant Employees Union, Local 2 (Local 2), which considers the Marriott Corporation (Marriott) an anti-union employer, urged the Agency not to award Marriott the project.

After a series of meetings, Local 2 and Marriott reached an agreement confirmed in a letter from Gary Wilson, Marriott's Senior Vice President, Finance and Development, to Charles Lamb, President, Local 2. Marriott agreed to (1) give first consideration in filling job vacancies to applicants referred by Local 2 (the basis of Local 2's "first consideration" claim); (2) determine whether Local 2 represented a majority of employees by a "card check" procedure instead of the usual National Labor Relations Board (NLRB) election procedure (basis of the "card check" claim);[1] and (3) remain silent as to whether its employees

---

1. In a card check procedure, employees are given cards asking them to designate the union as their bargaining representative. If a majority of the employees sign and return their cards, the union becomes the employees' exclusive bargaining representative. *See NLRB v. C & C Packing Co.*, 405 F.2d 935, 936 (9th Cir.1969). Typically, the cards are distributed and collect-

should authorize Local 2 to be their bargaining representative (basis of the "employer neutrality" claim).[2] In return, Local 2 withdrew its opposition to Marriott, which was awarded the project.

In 1989, Marriott announced its plan for hiring staff for the new hotel. The plan did not call for hiring Local 2 referrals on a first consideration basis. Instead, pursuant to Marriott's separate agreement with the Agency, first consideration was given to San Francisco residents displaced by the hotel.

Local 2 sued to enforce the letter agreement under section 301(a) of the Labor–Management Relations Act, 29 U.S.C. § 185(a).[3] The district court granted summary judgment for Marriott on the first consideration claim on the ground this clause of the agreement was unenforceably vague, and dismissed Local 2's card check and employer neutrality claims as within the NLRB's primary jurisdiction. Local 2 appeals both rulings.

### The "First Consideration" Clause [4]

■ Whether a labor contract is too vague to be enforced is governed by the

federal common law of labor contracts. See Local 3–7, Int'l Woodworkers v. Daw Forest Prods. Co., 833 F.2d 789, 792 (9th Cir.1987). Invalidating a contract as unenforceably vague is disfavored; "we avoid destruction of contracts because of uncertainty and construe them to effectuate the reasonable intentions of the parties if possible." Id. at 793. If the parties intended to make a contract, we will not frustrate that intention "even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." 1 Arthur L. Corbin, Corbin on Contracts § 95, at 400 (1963). A labor contract need only "be sufficiently certain 'such that the court can determine what the terms of [the] agreement are.'" Daw Forest, 833 F.2d at 793 (quoting Corbin, supra, § 95, at 394).

■ Clearly the parties intended to reach an agreement. The 1980 letter refers to "this agreement." Marriott contemporaneously informed the Agency it had reached an agreement with Local 2. Local 2 fully performed its obligations under the agree-

---

ed by the union without the employer's assistance. They are then "checked" for authenticity by a neutral party. See, e.g., id. at 936; Snow v. NLRB, 308 F.2d 687, 689 (9th Cir.1962).

2. The letter agreement stated in full:

Marriott Corporation is considering proposals under which it would manage hotels to be constructed in San Francisco at the Yerba Buena Center Redevelopment Project and at St. Mary's Square. This will confirm that the employer at each of said hotels will agree to a card check when authorization cards representing a majority of the nonmanagement employees employed at each respective hotel are presented to you.

This agreement is made with the specific understanding that Marriott will not express any opinion whether employees hired at these two properties should authorize Local 2 of the Hotel & Restaurant Employees and Bartenders Union as their collective bargaining agent.

Provided all other qualifications are equal, individuals referred by Local 2 of the Hotel & Restaurant Employees and Bartenders Union will be given first consideration in filling hotel job vacancies.

The current dispute does not concern Marriott's obligations with respect to the St. Mary's Square property.

3. Section 301 grants the district court jurisdiction to hear claims based on agreements "between employers and labor organizations significant to the maintenance of labor peace between them." Retail Clerks Int'l Ass'n, Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962). The letter agreement, designed to end union opposition to Marriott's involvement in the construction of a large hotel and to guide employment of the hotel staff, is such an agreement.

4. At oral argument, we questioned whether the dispute over enforceability of the first consideration clause was moot because all job vacancies at the Marriott hotel had been filled. We conclude it is not moot. Although it appears Local 2 will be unable to obtain specific performance of the agreement, Local 2 also asked for damages and "any further relief [to] which it is entitled." "[F]ederal courts have wide latitude in fashioning remedies in" cases involving breach of a labor contract. Local 3–7, Int'l Woodworkers v. Daw Forest Prods. Co., 833 F.2d 789, 794 (9th Cir.1987). The district court could fashion an appropriate remedy for any breach that occurred.

ment with Marriott's knowledge.[5] On the eve of this litigation, Marriott assured Local 2 the parties had an agreement and Marriott would honor it.

It is possible to effectuate the parties' intent. The agreement set forth Marriott's obligations in plain. language. Marriott was to give "first consideration" to "individuals referred by Local 2 of the Hotel & Restaurant Employees and Bartenders Union," "[p]rovided all other qualifications are equal." The meaning appears quite clear: When Local 2 referred a job applicant to Marriott, Marriott had to hire the Local 2 referral unless he or she was less qualified than another applicant.

■ The district court held the clause unenforceable because it could not determine whether Local 2 referrals had a right to first consideration for all jobs or only the "most lucrative." Neither party has advanced the latter interpretation and it has no support in the record.

■ The district court was also uncertain whether the clause applied to all persons referred by Local 2, regardless of union membership, or only to Local 2 members. The contract language on its face is unambiguous; it applies to Local 2 referrals without limitation. If extrinsic evidence establishes the parties actually intended to confine the benefits of the contract to Local 2 members the district court may so construe the contract, but the existence of this possibility is no reason to void the contract. *See, e.g., Warehousemen's Union Local No. 206 v. Continental Can Co.,* 821 F.2d 1348, 1350–51 (9th Cir.1987) (parties' disagreement over construction of contract terms is no basis for concluding contract was invalid or not formed).

■ Third, the district court was concerned because the contract contained no procedures for implementation: It did not state whether Marriott was obligated to contact Local 2 when it planned to fill vacancies or whether the burden was on Local 2 to keep abreast of Marriott's hiring needs. Where, as here, the parties clearly intend to enter into a binding agreement, the courts can and should imply incidental terms necessary to effectuate the contract's purposes. *See, e.g., Hotel del Coronado Corp. v. Foodservice Equip. Distribs. Ass'n,* 783 F.2d 1323, 1326 (9th Cir. 1986) (reasonable terms and method of payment could be implied).

■ Finally, the district court noted the contract did not specify how long Marriott was obligated to give first consideration to Local 2 referrals. Because the parties plainly intended to reach an agreement, the district court should have implied a durational term. The context in which the contract was drafted and the contract's purpose provide sufficient guideposts for making this determination.[6]

### The "Card Check" Clause

■ The "card check" clause of the 1980 letter agreement provided Marriott would

---

5. "The fact that one [party], with the knowledge and approval of the other, has begun performance is nearly always evidence that [the parties] regard the contract as consummated and intend to be bound thereby." Corbin, *supra,* § 95, at 407.

6. The contract was drafted in anticipation of the opening of a new hotel, which, as both parties knew, would require hiring hundreds of employees who might or might not favor unionization. It appears the contract's purpose was to increase the chance the hotel employees would select Local 2 as their bargaining representative; in exchange, Local 2 would withdraw its opposition to Marriott's participation in the project. Thus, Marriott agreed to give first consideration to applicants selected by Local 2, presumably people likely to vote for Local 2 as their representative; refrain from encouraging its employees to vote against unionization; and employ a "card check" procedure to determine whether Local 2 had majority support, a procedure the parties agree favored the union.

From this construction of the contract's purpose, it would be reasonable to infer Marriott was required to give first consideration to Local 2 referrals until the initial mass hiring was complete. At that point, Local 2 would have had a full opportunity to staff the hotel with pro-union employees, making it more likely the employees would vote in favor of unionization and choose Local 2 as their representative. A shorter duration would arbitrarily limit Local 2's influence over the employees' decisions; a longer duration would give Local 2 continuing control over Marriott's hiring decisions without directly advancing the contract's purpose of giving Local 2 influence over the employees' decisions on whether to unionize and whom to select as their bargaining representative.

"agree to a card check when authorization cards representing a majority of the non-management employees employed at [the] hotel [we]re presented to" Local 2. For purposes of this appeal, we accept Local 2's contention this clause confirmed Marriott's agreement to recognize Local 2 as exclusive bargaining representative if presented with authorization cards signed by a majority of employees, thereby waiving Marriott's right to call for an NLRB election. *Cf. NLRB v. Gissel Packing Co.*, 395 U.S. 575, 609, 89 S.Ct. 1918, 1937, 23 L.Ed.2d 547 (1969) ("an employer is not obligated to accept a [unilaterally-initiated] card check as proof of [a union's] majority status" and may insist on NLRB election and certification procedures even without "showing affirmative reasons for doubting the majority status"). The district court concluded it could not enforce such an agreement because to do so would involve the court in the resolution of a "representational" issue falling within the NLRB's primary jurisdiction.

■ We have recognized repeatedly that courts must refuse to exercise jurisdiction over claims involving representational issues; such issues are more appropriately resolved by the NLRB. *International Bhd. of Elec. Workers, Local 532 v. Brink Constr. Co.*, 825 F.2d 207, 211 (9th Cir. 1987); *John S. Griffith Constr. Co. v. United Bhd. of Carpenters*, 785 F.2d 706, 709 (9th Cir.1986); *Glaziers & Glassworkers Local Union #767 v. Custom Auto Glass Distribs.*, 689 F.2d 1339, 1343 (9th Cir.1982); *Local 3-193 Int'l Woodworkers v. Ketchikan Pulp Co.*, 611 F.2d 1295, 1298-99, 1301 (9th Cir.1980). Thus, the courts should not "designat[e] ... an exclusive bargaining agent" or "identif[y] ... an appropriate collective bargaining unit...." *Id.* at 1298.

■ However, we have also held that while the *courts* may not resolve represen-

tational issues, the *parties* may resolve these issues contractually. For example, in *Cappa v. Wiseman*, 659 F.2d 957 (9th Cir. 1981), we enforced an agreement defining an appropriate bargaining unit, *id.* at 960, even though determination of an appropriate bargaining unit is a representational issue falling within the NLRB's primary jurisdiction, *Ketchikan Pulp*, 611 F.2d at 1298.

Marriott relies on a narrow exception to the rule that the parties may decide representational issues by contract. We recognized this exception in *Ketchikan Pulp*, in which we refused to enforce an agreement between the employer and the union that the union would be the exclusive bargaining representative of all employees of all logging operations the employer acquired in the future. *Id.* at 1296-97. We did so, however, not because the agreement resolved representational issues, but because it resolved them in a manner contrary to existing federal labor policy. *Id.* at 1299-1301. The agreement was illegal and unenforceable because it deprived the employees at the employer's future sites of their right to choose their own bargaining representative. *Id.*

In contrast to the agreement in *Ketchikan Pulp*, Marriott's apparent agreement to accept the results of a card check in lieu of an NLRB election is consistent with federal labor policy. *See Houston Div. of the Kroger Co. (Kroger)*, 219 NLRB 388, 389 (1975) (national labor policy favors enforcing contract clauses waiving employer's right to demand an election); *see also NLRB v. Cam Indus.*, 666 F.2d 411, 412, 414 (9th Cir.1982) (enforcing an NLRB order based on an employer's agreement to accept the results of a card check). To the extent Local 2 seeks a declaration that Marriott has a contractual obligation to accept the results of a card check, the district court has jurisdiction to hear the claim.[7]

---

7. Contrary to Marriott's suggestion, enforcement of the agreement to conduct a card check will not require the district court to determine an "appropriate bargaining unit" in which to conduct the card check. Marriott and Local 2 defined the appropriate bargaining unit by agreeing that the card check would be conducted among "the nonmanagement employees" at the Marriott hotel. The record indicates the parties may have modified the agreement in 1989, confining the card check to Local 2's "traditional bargaining unit." Whether or not the

Local 2, however, asks more. Local 2 requests an order compelling Marriott to "cooperate" in the performance of the card check. Specifically, Local 2 seeks a declaration that Marriott must "provide Local 2 with reasonable access to non-public areas of the hotel to meet with employees" and with "the names, addresses and phone numbers of the hotel's employees."

The basis of Local 2's claim is unclear. If the claim is that the district court should declare federal labor policy requires an employer to provide such cooperation when the employer agrees to a card check in lieu of an NLRB election, the district court plainly lacks jurisdiction to hear that claim. "[T]he doctrine of primary jurisdiction is a recognition of congressional intent to have matters of national labor policy decided in the first instance by the National Labor Relations Board." *Glaziers & Glassworkers*, 689 F.2d at 1342. Congress directed the NLRB, not the courts, to determine an employer's obligations during the process of selecting a bargaining representative. *See NLRB v. Waterman S.S. Corp.*, 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704 (1940); *NLRB v. Falk Corp.*, 308 U.S. 453, 459, 60 S.Ct. 307, 310, 84 L.Ed. 396 (1940).

If Local 2's argument is that Marriott's alleged obligations during the card check process are implicit in the card check agreement itself, the district court lacks jurisdiction for the same reason. The agreement makes no mention of the degree of cooperation required of Marriott nor does the record indicate the parties reached such an agreement but failed to express it in writing. Thus, Local 2's claim is essentially that public policy implies into all card check agreements the employer's obligation to give the union access to its property and a list of its employees. Again, it is the NLRB, not the courts, that should determine policy in this field.[8]

### The "Employer Neutrality" Clause

■ The district court also concluded the NLRB had exclusive jurisdiction to enforce Marriott's agreement not to express any opinion on whether its employees should choose Local 2 as their exclusive bargaining representative. Again, we disagree. Enforcement of the neutrality clause raises no representational issues. The district court will not be required to "designat[e] ... an exclusive bargaining agent" or "identif[y] ... an appropriate collective bargaining unit," *Ketchikan Pulp*, 611 F.2d at 1298, or to resolve any other representational issues not already resolved by the parties. *See Amalgamated Clothing & Textile Workers Union v. Facetglas, Inc.*, 845 F.2d 1250, 1251, 1253 (4th Cir.1988) (court could not enforce a wage agreement contingent on result of election when it would first have to deter-

---

1989 modifications were effective, the parties agreed to a bargaining unit, eliminating any possibility that enforcement of the contract by the district court would encroach upon the NLRB's primary jurisdiction to make this determination.

Nor will the district court be required "to establish a procedure for verifying the authenticity of signed cards ..., select the form of the cards to be used, and determine how long a signed card is to remain valid," as Marriott contends. The district court can determine whether Marriott has consented to a card check in lieu of an NLRB supervised election without determining the mechanics of the card check. If and when Local 2 claims it has received cards signed by a majority of employees in the agreed-upon bargaining unit, any dispute as to the authenticity or validity of the cards can be submitted to the appropriate forum.

**8.** We find without merit Local 2's argument that the district court should have exercised jurisdic-

tion because Marriott's failure to live up to the card check clause would not constitute an unfair labor practice, and therefore Local 2 has no NLRB remedy. The NLRB can and does enforce employers' agreements to waive their rights to the NLRB's regular election and certification procedures and substitute alternative procedures. *See, e.g., Cam Industries*, 666 F.2d at 412; *Kroger*, 219 NLRB at 389.

Further, an unfair labor practice proceeding is the appropriate forum for Local 2's claim that when a union seeks recognition through a contractually established card check procedure, federal labor policy requires the employer to provide the union with a list of employees and access to the employer's property and otherwise cooperate in the card check process. *Cf. Excelsior Underwear Inc.*, 156 NLRB 1236, 1239 (1966) (union seeking recognition through NLRB supervised election is entitled to list of employees' names and addresses).

mine validity of election by deciding whether certain employees were part of the bargaining unit; court could enforce employer neutrality clause).

The agreement is therefore enforceable unless it contravenes existing federal labor policy. Nothing in the relevant statutes or NLRB decisions suggests employers may not agree to remain silent during a union's organizational campaign—something an employer is certainly free to do in the absence of such an agreement.[9] Accordingly, the district court has jurisdiction to enforce this provision of the agreement.

### Legality of the Contract

Marriott argues the 1980 letter agreement was the product of illegal pressure by the San Francisco Redevelopment Agency and is therefore void.[10] Marriott contends the Agency threatened not to award the project to Marriott unless Marriott obtained Local 2's support.

Whether the Agency conditioned the award of the project to Marriott on Marriott's settlement of its dispute with Local 2 is plainly a question of fact. The district court made no relevant factual findings because it dismissed Local 2's claims on other grounds. We therefore cannot address the merits of Marriott's arguments, which Marriott is free to raise again on remand.

Marriott shall bear the costs of this appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**9.** The district court appeared to suggest Marriott's agreement to remain silent is inconsistent with section 8(c) of the Labor–Management Relations Act, 29 U.S.C. § 158(c). However, section 8(c) merely states an employer does not commit an unfair labor practice by expressing its views regarding unionization. This provision does not suggest an employer's agreement not to express its views is unenforceable.

**10.** Marriott relies upon *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614–19, 106 S.Ct. 1395, 1398–1401, 89 L.Ed.2d 616 (1986), which held local government entities may not use their power to influence the outcome of labor disputes. Marriott argues any contract that is a product of government intervention prohibited by *Golden State Transit* is void or voidable. Marriott also argues the Agency's conduct constituted duress.