344 F.3d 977
 Service Employees International Union; Service Employees International Union, Local 399, Plaintiffs-Appellants,
v.
St. Vincent Medical Center; Daughters of Charity Health Systems, Inc., Defendants-Appellees.
 No. 02-56058.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 8, 2003.
 Filed September 19, 2003.
 
 Benjamin Sachs, Staff Attorney, SEIU, Washington, D.C., for the plaintiffs-appellants.
 Philip L. Ross, Littler Mendelson, PC, San Francisco, California, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Manuel L. Real, District Judge, Presiding. D.C. No. CV-02-02740-R.
 Before PREGERSON, TASHIMA, and CLIFTON, Circuit Judges.
 OPINION
 PREGERSON, Circuit Judge.
 
 
 1
 At issue in this case is the arbitrability of alleged violations of an agreement between Plaintiffs Appellants Service Employees International Union ("SEIU") and Service Employees International Union, Local 399 ("SEIU Local 399") (collectively "the Union") and Defendants Appellees St. Vincent Medical Center and the Daughters of Charity Health Systems, Inc. ("DOCHS") (collectively "the Employer"). The National Labor Relations Board ("NLRB") conducted a representational election at St. Vincent Medical Center. The Union lost the election. The Union then alleged that the Employer violated various provisions of an agreement that restricted the parties' behavior during union organizing campaigns. Specifically, the Union contended that during the union organizing drive at St. Vincent Medical Center, the Employer committed eighteen acts in direct violation of the agreement, including encouraging workers to vote against unionization, giving support and assistance to anti-union workers, unreasonably restricting access to conference rooms, interrogating workers about their support for the union, and making inflammatory religious appeals to employees. Pursuant to the agreement, the Union sought to arbitrate these alleged violations. When the Employer refused to arbitrate, the Union filed a complaint with the district court to compel arbitration. In response, the Employer filed a motion to dismiss the complaint arguing, in part, that the Union's complaint dealt with "a purely representational matter" and thus the district court lacked jurisdiction under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The district court granted the Employer's motion to dismiss the Union's complaint and dismissed the Union's complaint to compel arbitration in its entirety, with prejudice.
 
 
 2
 We conclude that the dispute before us is primarily contractual, not representational. We further conclude that the arbitration clause in the agreement is susceptible of an interpretation that covers the present dispute. We, therefore, reverse the district court's order dismissing with prejudice the Union's complaint to compel arbitration.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 The Union and Catholic Healthcare West ("CHW") signed an agreement ("the Agreement") on April 4, 2001.[1] CHW entered into the Agreement on behalf of itself and its facilities, including St. Vincent Medical Center. The Agreement stated that the parties had "decided to undertake a new approach to providing quality care for patients and quality jobs for health care employees." Through the Agreement, the parties committed themselves "to a process that resolves issues between us in a manner that not only reduces conflict, but also fosters a growing appreciation for our respective missions."[2]
 
 
 4
 The Agreement provided that the Union and CHW would work together to advance common concerns, such as a commitment to quality, accessible health care, and would not "engage in personal attacks or derogatory comments concerning the basic mission of their respective organizations." Pertinent to the appeal before this court, the Agreement also provided Guidelines and a New Recognition Procedure: "The parties agree[d] that the following commitments and recognition procedure will govern with respect to organizing and recognition processes at all existing ... CHW facilities [including St. Vincent Medical Center]." The Guidelines, setting forth the rules that would govern the parties' conduct during an organizing drive, stated that:
 
 
 5
 1. CHW and SEIU agree that employees shall be entitled to make a decision regarding union representation free from coercion, intimidation, promises, or threats.
 
 
 6
 2. CHW and SEIU agree that their representatives will communicate only that which is factual....
 
 
 7
 3. CHW representatives will not inform or imply to eligible voters that they will lose benefits, wages or be subject to less favorable working conditions by unionizing.
 
 
 8
 4. CHW agrees that its communication with employees regarding unionization shall take place through literature or in group meetings and that its supervisors and managers shall not initiate one-on-one conversations with employees about unionization....
 
 
 9
 5. Employee participation in any group meeting for the primary purpose of discussing unionization shall be voluntary.
 
 
 10
 6. No employee shall have his/her right to determine whether or not to be represented by a Union abridged in any manner by reason of his/her citizenship or immigration status....
 
 
 11
 The Agreement set forth a procedure run by a jointly selected Election Officer for a secret ballot election to determine the employees' preference regarding union representation. Under the Agreement, however, the Union had the option to "petition the NLRB for an election under the same rules in [the Agreement's] recognition procedure. In such situation, the NLRB shall substitute for the role of the Election Officer, but all other aspects of the recognition procedure shall apply, except as adjustments may be required by the NLRB" ("the NLRB election option"). The Agreement further provided that "disputes under this Agreement, including the Guidelines and Recognition Procedure will be resolved according to the Mediation and Arbitration provision in this Agreement."[3]
 
 
 12
 After the Agreement was executed, the Union embarked on an organizing drive at St. Vincent Medical Center. The Union contends that during the course of the union organizing campaign, the Employer did not comply with the Agreement's mandated restrictions on the Employer's conduct.
 
 
 13
 Consistent with the terms of the Agreement, the Union elected to invoke the NLRB election option. On September 7, 2001, the Union signed a stipulation agreeing that the NLRB would conduct the secret ballot election on September 26 and 27, 2001. According to the stipulation, the "terms and conditions as contained in the Stipulated Election Agreements previously executed by the parties in these matters shall still apply." Under the Stipulated Election Agreement signed by the Union and the Employer in 2000, "postelection and runoff procedures" after the ballots were counted would conform to the NLRB's Rules and Regulations.
 
 
 14
 The NLRB conducted an election at St. Vincent Medical Center on September 26 and 27, 2001. The Union lost; the NLRB issued a Tally of Ballots on September 27, 2001, showing that a majority of the valid votes plus challenged ballots had not been cast for the Union. On October 16, 2001, the NLRB certified the election results: "It is certified that a majority of the valid ballots have not been cast for any labor organization and that no labor organization is the exclusive representative of these employees in the bargaining unit described below."
 
 
 15
 On October 2, 2001, the Union sent a letter via fax to CHW. The letter charged CHW with committing eighteen violations of the Agreement during the Union's organizing drive at St. Vincent Medical Center. The alleged violations included:
 
 
 16
 2. CHW, acting through its agents, violated Section II.C.9 of the Agreement by encouraging workers to vote against unionization.
 
 
 17
 3. CHW, acting through its agents, violated Section II.C. of the Agreement by having its supervisors wear anti-union buttons.
 
 
 18
 ....
 
 
 19
 5. CHW, acting through its agents, violated the Agreement by granting more favorable working conditions to employees on the "Vote No" committee, and by granting less favorable working conditions to open union supporters.
 
 
 20
 ....
 
 
 21
 8. CHW, acting through its agents, violated Section II.C.2 and II.C.9 of the Agreement by posting information about unions (and specifically SEIU Local 399) that was not factual.
 
 
 22
 ....
 
 
 23
 10. CHW, acting through its agents, violated Section II.C.1 of the Agreement by threatening workers with loss of benefits in order to discourage them from voting to unionize.
 
 
 24
 11. CHW, acting through its agents, violated Section II.C.5 of the Agreement by holding mandatory group meetings with workers regarding unionization.
 
 
 25
 12. CHW, acting through its agents, violated Section II.C.1 of the Agreement by interrogating workers about their support for the union.
 
 
 26
 ....
 
 
 27
 16. CHW, acting through its agents, violated the Agreement by making inflammatory religious appeals to employees.
 
 
 28
 On December 20, 2001, the Union sent a letter to CHW and DOCHS regarding the transfer of governance of seven CHW hospitals, including St. Vincent Medical Center, to DOCHS. The letter stated that based on previous conversations, the Union understood that "DOCHS will take over CHW's obligations, if any, with respect to any outstanding legal claim (such as litigation, ULP or arbitration matter) regarding labor relations at DOCHS facilities, including, but not limited to, the Union's pending objections/arbitration over the St. Vincent Hospital election."
 
 
 29
 On January 3, 2002, counsel for DOCHS responded to the Union's letter and agreed that "effective January 1, 2002 the Daughters of Charity Health Systems (DOCHS) hospitals ... inherit[] the labor relations situation and obligations at that specific hospital as of January 1, 2002." The letter, however, stated that:
 
 
 30
 concerning St. Vincent Medical Center and the National Labor Relations Board election in the unit involving the service and maintenance employees, I am advised that no timely objections were ever filed with the [NLRB]. I am further advised that no request for arbitration has been made regarding any purported objections to the election. Accordingly, no valid objections to the NLRB election exist.
 
 
 31
 In response, on January 16, 2002, the Union sent a letter to DOCHS stating that "SEIU has the right to submit the St. Vincent election objections, which were filed under the April 4, 2001 Agreement, to arbitration under that Agreement's arbitration clause. Please consider this letter to be a reaffirmation that SEIU wishes to submit this unresolved dispute to arbitration."
 
 
 32
 In a letter dated January 24, 2002, DOCHS replied and refused the Union's request for arbitration, asserting that the Agreement did not apply to the election because the NLRB — and not a private election officer—ran the election.
 
 
 33
 On April 3, 2002, the Union filed a complaint to compel arbitration in the United States District Court for the Central District of California arguing that the refusal of the Employer to arbitrate the dispute was a violation of the Agreement. The Union stated that the district court had jurisdiction under § 301 of the LMRA. The Union sought an order compelling the Employer "to arbitrate the dispute regarding SEIU's objections to the September 26 and 27, 2001 election."
 
 
 34
 On May 13, 2002, the Employer filed a motion to dismiss the Union's complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The Employer argued that the district court lacked subject matter jurisdiction because the complaint raised a purely representational matter over which the NLRB possessed primary jurisdiction and thus was not subject to the court's jurisdiction under § 301 of the LMRA. The Employer further argued that the Union's complaint failed to state a claim upon which relief could be granted because "[a]s a matter of law, [the Union is] not entitled to have untimely election objections to an NLRB-conducted election heard and decided by an arbitrator."
 
 
 35
 "After considering all papers submitted and oral argument heard and for good cause appearing," the district court, Honorable Manuel L. Real presiding, granted the Employer's motion without further explanation. The district court ordered that the Union's complaint to compel arbitration be dismissed in its entirety with prejudice. The Union now appeals.
 
 II. DISCUSSION
 
 36
 To determine whether the district court erred in granting the Employer's motion to dismiss we must decide whether the district court had jurisdiction under § 301 of the LMRA and whether the Union stated a claim upon which relief could be granted.[4] Because we find that "[t]he heart of the case is a contractual rather than representational dispute," Pace v. Honolulu Disposal Serv., Inc., 227 F.3d 1150, 1152 (9th Cir.2000), we hold that the doctrine of "primary jurisdiction" does not prevent the district court from compelling arbitration of alleged violations of the Agreement governing the parties' conduct during an organizing drive. Therefore, the district court has jurisdiction under § 301 of the LMRA.
 
 
 37
 The fact that the NLRB conducted the election at St. Vincent Medical Center or certified the election results does not prevent the district court from compelling arbitration of the alleged contractual violations. The Agreement states that "disputes under this Agreement, including the Guidelines and Recognition Procedure, will be resolved according to the Mediation and Arbitration provision in this Agreement;" the arbitration clause provides that "the Parties agree to submit any unresolved disputes about compliance with or construction of this Agreement for final and binding resolution by an Arbitrator." We therefore hold that because the arbitration clause in the Agreement is "susceptible of an interpretation that covers the asserted dispute," AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), the Union stated a claim upon which relief can be granted. The district court erred in not compelling arbitration of the alleged contractual violations.
 
 
 38
 A. The district court erred in determining it lacked subject matter jurisdiction
 
 
 39
 Section 301 of the LMRA vests federal courts with jurisdiction over cases involving the violation of private labor agreements: "Suits for violation of contracts between an employer and a labor organization ... may be brought in any district court in the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). Although district courts have concurrent jurisdiction with the NLRB over such cases, federal courts "must tread lightly" in areas of the NLRB's primary jurisdiction and must defer to the NLRB "when, on close examination, section 301 cases fall within the NLRB's primary jurisdiction." United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus., Local 342 v. Valley Eng'rs, 975 F.2d 611, 613-14 (9th Cir.1992).
 
 
 40
 To determine whether a case is within the NLRB's primary jurisdiction, "we have drawn the jurisdictional line by asking `whether the major issues to be decided ... can be characterized as primarily representational or primarily contractual.'" Pace, 227 F.3d at 1157 (quoting Valley Eng'rs, 975 F.2d at 614). We conclude that the major issue to be decided in this case — the arbitrability of the alleged violations of the Agreement — is primarily contractual. Unlike Valley Eng'rs, in which we found that the case was "primarily representational," the interpretation of the Agreement in this case does not "depend[] entirely on the resolution of the question of whom the union represents." 975 F.2d at 614 (quoting Cappa v. Wiseman, 659 F.2d 957, 960 (9th Cir.1981) (Fletcher, J., dissenting)). The interpretation of the Agreement in this case does not depend even partially on "the question of whom the union represents." Id. Rather, the interpretation of the Agreement depends on whether the arbitration clause in the Agreement is "susceptible of an interpretation that covers the asserted dispute." AT & T Techs., 475 U.S. at 650, 106 S.Ct. 1415. Although this case concerns alleged violations of the Agreement's restrictions on the parties' behavior during an organizing drive before a representational election, the major issue cannot be characterized as primarily representational. A case does not fall on the NLRB's primary jurisdiction side of the jurisdictional line merely by having "`representational' overtones." Pace, 227 F.3d at 1157.
 
 
 41
 Although the Agreement in this case is not labeled a "neutrality agreement,"[5] the Agreement is similar in many regards to the "employer neutrality" clause in Hotel and Restaurant Employees Union v. Marriott Corp., 961 F.2d 1464, 1469 (9th Cir.1992). In Marriott, we held that the district court had jurisdiction under § 301 over the neutrality clause because "[e]nforcement of the neutrality clause raises no representational issues." Id. Like the "employer neutrality" clause in Marriott, the contested portion of the Agreement in this case governs and restricts the parties' actions during an organizing drive. While the hotel in Marriott agreed not to express any opinion on whether its employees should choose the union as their exclusive bargaining representative, here, the Employer agreed to communicate only that "which is factual" and "not [to] initiate one-on-one conversations with employees about unionization." Just as in Marriott, the district court in the present case will not be required to "designate ... an exclusive bargaining agent" or "identify ... an appropriate collective bargaining unit." Id. (quoting Local No. 3-193 Int'l Woodworkers v. Ketchikan Pulp Co., 611 F.2d 1295, 1298 (9th Cir.1980)). Nor will the district court be required to "resolve any other representational issues not already resolved by the parties." Id. Rather, the district court in the present case would merely be required to determine whether the arbitration clause in the Agreement is "susceptible of an interpretation that covers the asserted dispute," and if so to compel arbitration. Dutra Group, 279 F.3d at 1078. Compelling arbitration of the alleged contractual violations will not require the naming of an exclusive bargaining agent or a collective bargaining unit. Marriott, 961 F.2d at 1469 (quoting Ketchikan Pulp Co., 611 F.2d at 1298). The Agreement clearly states that "in no case, may the Arbitrator ... compel recognition of the Union where a majority of the voters have not selected representation by the Union." We therefore conclude that while this case concerns allegations regarding the parties' behavior before a representational election, and thus has representational overtones, compelling arbitration of the alleged violations of the Agreement — like the enforcement of the neutrality clause in Marriott — "raises no representational issue." Id. at 1469.[6] Rather, "[t]he heart of th[is] case is a contractual rather than representational dispute." Pace, 227 F.3d at 1152.
 
 
 42
 The Employer, however, argues that this case is entirely distinguishable from Marriott, because here the Union chose an NLRB-conducted election; the NLRB was not involved in Marriott. The Employer argues that once the Union chose the NLRB election option, any dispute following the election became a "representational issue" under the primary jurisdiction of the NLRB. We disagree. The presence of the NLRB does not place all issues of a case within the NLRB's primary jurisdiction. Instead, the court still must ask "whether the major issues to be decided ... can be characterized as primarily representational or primarily contractual." Pace, 227 F.3d at 1157 (quoting Valley Eng'rs, 975 F.2d at 614). We have already answered that question and found that the major issue in this case—the arbitrability of alleged violations of the Agreement—is contractual. Therefore, we hold that the district court has jurisdiction to compel arbitration of alleged contractual violations under § 301 of the LMRA.
 
 
 43
 B. The district court erred in finding that the Union failed to state a claim upon which relief can be granted
 
 
 44
 In Dutra Group, we recently reiterated a general principle of labor law stating a strong preference for the arbitration of labor-management disputes:
 
 
 45
 Where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.
 
 
 46
 Dutra Group, 279 F.3d at 1078 (quoting AT & T Techs., 475 U.S. at 650, 106 S.Ct. 1415).
 
 
 47
 Notwithstanding this presumption of arbitrability when a labor-management agreement contains an arbitration clause, as the present Agreement does, the Employer contends that the district court was correct in granting the Employer's motion to dismiss under Fed.R.Civ.P. 12(b)(6)—failure to state a claim upon which relief can be granted. The Employer argues that because the NLRB has already "certified" the results of the election, it is "improper for a federal court to permit a re-opening of the representation proceeding through the guise of permitting an arbitrator to decide untimely election objections." But as we stated above, the issue before us is not "the question of whom the union represents," Valley Eng'rs, 975 F.2d at 614, or any other representational issue. Rather, the issue is the arbitrability of the alleged violations of the Agreement.
 
 
 48
 We find that the presumption of arbitrability applies in this case because the arbitration clause is "susceptible of an interpretation that covers the asserted dispute." AT & T Techs., 475 U.S. at 650, 106 S.Ct. 1415. The Agreement states that "disputes under this Agreement, including the Guidelines [governing the parties' behavior during organizing campaigns] and Recognition Procedure, will be resolved according to the Mediation and Arbitration provision in this Agreement." The arbitration clause provides that "the Parties agree to submit any unresolved disputes about compliance with or construction of this Agreement for final and binding resolution by an Arbitrator." Furthermore, the Agreement states that under the NLRB election option, "the NLRB shall substitute for the role of the Election Officer, but all other aspects of the recognition procedure shall apply, except as adjustments may be required by the NLRB." (emphasis added). There is no evidence that the NLRB required any "adjustments" to the Agreement governing the parties' behavior during the organizing drive or to the parties' contractual obligation to arbitrate disputes "about compliance with or construction of this Agreement."
 
 
 49
 The Employer, however, contends that the Agreement does not cover any objections to the election[7] because the NLRB conducted the election and all objections needed to be brought according to NLRB procedure. To support its argument, the Employer points to the stipulation signed by the Union on September 7, 2001, agreeing that the NLRB would conduct the secret ballot election. The September 7, 2001 stipulation referred to a previous "Stipulated Election Agreement" signed by the parties in 2000, in which "postelection and runoff procedures ... after the ballots are counted shall conform with the Board's Rules and Regulations." If the Union were objecting to the validity of the NLRB-conducted election, as the Employer claims, then such "postelection procedure" would have to conform to the NLRB's Rules and Regulations. But the Union's allegations that the Employer violated the Agreement arises out of the Agreement and not the NLRB's Rules and Regulations. Even assuming, arguendo, that the Employer is correct that the Union became bound by the NLRB's rules and procedures when it opted for an NLRB election, there is a valid argument that the arbitration clause covers the asserted dispute concerning the Employer's violations of the Agreement. "Doubts should be resolved in favor of coverage." AT & T Techs., 475 U.S. at 650, 106 S.Ct. 1415.
 
 
 50
 Likewise, the Employer's other argument as to why the district court was correct in finding that the Union did not state a claim upon which relief can be granted is not persuasive. The issue whether the Union timely filed the alleged violations of the agreement is an issue left to the arbitrator, not this court. See Retail Delivery Drivers, Local 588 v. Servomation Corp., 717 F.2d 475, 478 (9th Cir.1983); United Food & Commercial Workers Union, Local 770 v. Geldin Meat Co., 13 F.3d 1365, 1368 (9th Cir.1994) (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)) ("[J]udicial inquiry ... must be strictly confined to the question whether the reluctant party did agree to arbitrate.").
 
 
 51
 Therefore, we hold that under Supreme Court law and the law of this circuit, the Union stated a claim for which relief may be granted, namely that the district court should compel arbitration under the Agreement based on the Employer's alleged violations of the Agreement.
 
 CONCLUSION
 
 52
 Accordingly, we REVERSE the district court's order dismissing the Union's complaint to compel arbitration and REMAND for entry of an order compelling arbitration of the alleged contractual violations.
 
 
 53
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 CHW transferred its interest in St. Vincent Medical Center to the DOCHS, on or about January 1, 2002; CHW is not a party in these proceedings. In an agreement with CHW, DOCHS agreed to be bound by the above mentioned Agreement between the Union and CHW
 
 
 [2]
 The Union notes in its brief that "[t]he Agreement at issue here reflects the parties' recognition that, despite the National Labor Relations Board's (`NLRB's' or `Board's') efforts to regulate the process, union organizing campaigns are too often marred by `bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortion.'" (quotingLinn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)).
 
 
 [3]
 The arbitration provision states:
 Arbitration: Except as otherwise provided herein, the Parties agree to submit any unresolved disputes about compliance with or construction of this Agreement for final and binding resolution by an Arbitrator selected through the American Arbitration A[ssociation] (AAA) Special Panel or by mutual agreement.... As part of his/her decision, the Arbitrator shall have the discretion to order remedy to resolve the dispute. However, in no case, may the Arbitrator or Election Official compel recognition of the Union where a majority of the voters have not selected representation by the Union.
 
 
 [4]
 This court reviews de novo the grant of a motion to dismissInlandboatmens Union of the Pac. v. Dutra Group, 279 F.3d 1075, 1078 (9th Cir.2002).
 
 
 [5]
 See Charles I. Cohen, Neutrality Agreements, 16 Lab. Law. 201 (2000); George N. Davies, Neutrality Agreements: Basic Principles of Enforcement and Available Remedies, 16 Lab. Law. 215 (2000).
 
 
 [6]
 We recognize that our conclusion would be different if the Union had challenged the outcome of the election before this court, and not alleged violations of a contract: "Indeed, we have warned that `end run[s] around Section 9 of the [National Labor Relations] Act ... under the guise of contract interpretation ... cannot be countenanced.'"Pace, 227 F.3d at 1157 (quoting Ketchikan Pulp, 611 F.2d at 1299-1300). We further have "recognized repeatedly that courts must refuse to exercise jurisdiction over claims involving representational issues." Marriott, 961 F.2d at 1468.
 
 
 [7]
 The parties dispute whether the Union is contesting "objections to the election," "election objections," or "violations of our Agreement." Regardless of the technical label, the Union is objecting to the behavior of the Employer in violation of the Guidelines that the parties agreed upon to govern their conduct during the organizing and pre-election drive. The Union's request in its complaint that the district court compel arbitration of "the dispute regarding SEIU's objections to the September 26 and 27, 2001 election," is not "fatal to its argument that it is supposedly not raising a representational issue" as the Employer contends. Reading the complaint, it appears that the Union is not objecting to the end result of the election, or attempting to invalidate the results of the election. But rather, the Union is attempting to arbitrate "[t]hese objections [that] consisted of a series of allegations that Catholic Healthcare West, St. Vincent, and DOCHS violated the Agreement."