# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERNATIONAL UNION OF
PAINTER AND ALLIED TRADES,
DISTRICT 15, LOCAL 159,
                    *Petitioner-Appellant,*

            v.

J&R FLOORING, INC., dba J. Picini
Flooring; FREEMAN'S CARPET
SERVICE, INC.; FCS FLOORING, INC.;
FLOORING SOLUTIONS OF NEVADA,
INC., dba FSI,
                    *Respondents-Appellees.*

No. 08-17089

D.C. No.
2:07-cv-01677-
RLH-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, Chief District Judge, Presiding

Argued and Submitted
December 10, 2009—San Francisco, California

Filed July 30, 2010

Before: Mary M. Schroeder and Consuelo M. Callahan,
Circuit Judges, and Barbara Lynn,* District Judge.

Opinion by Judge Schroeder

---

*The Honorable Barbara Lynn, United States District Judge for the
Northern District of Texas, sitting by designation.

## COUNSEL

David A. Rosenfeld, Alameda, California, for plaintiff-appellant International Union of Painters and Allied Trades, District 15, Local 159.

Gregorey E. Smith, Las Vegas, Nevada, for appellees J&R Flooring, Inc., Freeman's Carpet Service, Inc., and FCS Flooring, Inc.

Thomas A. Lenz, Cerritos, California, for appellee Flooring Solutions of Nevada, Inc.

## OPINION

SCHROEDER, Circuit Judge:

This appeal raises interesting questions about the relationship between the primary jurisdiction of the National Labor Relations Board ("NLRB" or "the Board") to determine repre-

sentational disputes and the scope of arbitration under a construction industry collective bargaining agreement that, together with a broad arbitration clause, also contains a provision about determining majority representation. The underlying dispute involves whether the Union appropriately established that it represented a majority of the employees before the expiration of the agreement, so as to qualify for recognition under Section 9(a) of the National Labor Relations Act ("NLRA" or "the Act"). If it did so, it would enjoy a presumption of majority status giving rise to an obligation on the part of the Employers to bargain for a new contract with the Union.

The Union takes the position that it did establish majority status, while the Employers say it did not. After originally filing a charge with the NLRB, the Union ultimately filed this action to compel arbitration of the dispute in district court. The Employers now take the position that the issue is properly before the NLRB, where the Administrative Law Judge ("ALJ") ruled that the charges should be dismissed. The case remains pending on appeal before the Board.

Under our Circuit's law, the legal issue here is whether the dispute is primarily representational or contractual. *See Serv. Employees Int'l Union, Local 399 v. St. Vincent Med. Ctr.*, 344 F.3d 977, 982-83 (9th Cir. 2003). A primarily contractual dispute would potentially be arbitrable, whereas a primarily representational dispute would not be. Because we conclude that this particular dispute is principally representational, we affirm the district court's decision dismissing the action on the ground that the dispute falls within the primary jurisdiction of the NLRB.

## STATUTORY BACKGROUND

At issue in this case is whether the Union was the bargaining agent for the employees pursuant to § 8(f) or § 9(a) of the NLRA at the time the collective bargaining agreement

expired. Section 9(a) of the Act establishes that a union selected by a majority of employees in a bargaining unit shall be the employees' exclusive bargaining representative. 29 U.S.C. § 159(a). Once a union has achieved § 9(a) majority status, an employer's obligation to bargain with the union continues beyond the term of any particular collective bargaining agreement. This is the result of long-standing Board policy. *See Levitz Furniture Co. of the Pacific, Inc.*, 333 NLRB 717, 721 (2001).

In most industries, it is an unfair labor practice for an employer to bargain with a union that does not have majority support, or for an employer to promise a union that it will require prospective employees to join the union as a condition of employment. *NLRB v. Local Union No. 103*, 434 U.S. 335, 344-45 (1978). The construction industry, however, operates under its own set of statutory rules. In 1959, Congress recognized that the short-term nature of the industry's hiring often precluded unionization pursuant to § 9(a), and responded by adding § 8(f) to the NLRA. *See* 29 U.S.C. § 158(f); *Todd v. Jim McNeff, Inc.*, 667 F.2d 800, 801-02 (9th Cir. 1982). Section 8(f) provides that employers may enter into a prehire agreement requiring union membership as a condition of employment, notwithstanding the union's lack of majority status. *Todd,* 667 F.2d at 801-02. Though it is easier for unions to organize under § 8(f), it is Board policy that unions formed under that provision do not enjoy a presumption of majority status once the collective bargaining agreement expires; at that point in time, the § 8(f) relationship is terminable by either party. *John Deklewa & Sons*, 282 NLRB 1375, 1387 (1987), *enforced sub nom. Iron Workers Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988); *Madison Indus. Inc.*, 349 NLRB 1306, 1307-08 (2007).

Because of the more tenuous nature of representation under § 8(f), some unions that initially organize under that provision attempt to convert to § 9(a) majority status, and the Board has held that an employer may contractually agree to voluntary

recognition on the basis of the union's showing of majority support. *Staunton Fuel & Material, Inc.*, 335 NLRB 717, 719-20 (2001); *Madison Indus., Inc.*, 349 NLRB at 1308. The parties dispute in this case whether the union was successful in effectuating such a conversion before the contract expired.

## FACTUAL BACKGROUND

Defendants are four Nevada contractors engaged in commercial and industrial flooring—J&R Flooring, Inc., Freeman's Carpet Service, Inc., FCS Flooring, Inc., and Flooring Solutions of Nevada, Inc. (collectively, "the Employers"). The Employers and plaintiff International Union of Painters and Allied Trades, District Council 15, Local 159 ("the Union") operated for several years under the auspices of a common collective bargaining agreement ("the agreement" or "CBA") governed by § 8(f). That agreement, effective February 1, 2004, through January 31, 2007, established a mechanism through which the Union's representation pursuant to § 8(f) could be changed to one governed by § 9(a).

The parties' agreement, at Article 4, provides that the Employer will recognize the Union if it has majority status and will permit a card check conducted by a third party to determine whether the Union has achieved majority status. Article 4 of the CBA provides:

> The Employer hereby recognizes the Union as the sole and exclusive bargaining agent of employees classified herein . . . . The Employer agrees that if a majority of its employees authorize the Union to represent them in collective bargaining, the Employer will recognize the Union as the NLRA Section 9(a) majority collective bargaining agent for all employees performing work within the jurisdiction of this Agreement. The Employer agrees furthermore upon demand by the Union to submit to a third party card check to determine the majority status of the Union.

> Any disputes concerning this provision shall be resolved by expedited arbitration under the terms of this Agreement.

A "card check" is a voluntary method for determining whether a union enjoys majority status without resort to a Board-supervised election. *See* John E. Higgins, Jr., *The Developing Labor Law* 733-34 (5th ed. 2006). In a typical card check procedure, the union collects signature cards from employees designating the union as their bargaining representative. *Hotel Employees, Rest. Employees Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1465-66 n.1 (9th Cir. 1992). Once the union collects cards from a majority of employees and presents them to the employer, generally a mutually agreeable neutral party verifies the cards for authenticity. *Id.*

In addition to the card check provision, Article 22 of the agreement establishes a general grievance and arbitration procedure. Article 22 creates a joint labor-management committee that is charged with hearing "disputes and grievance[s] that may arise out of the application or interpretation" of the agreement in the first instance, and also provides for arbitration where a "decision cannot be reached" in committee.

Two months before the parties' § 8(f) agreement was due to expire, the Union notified the Employers that it wished to bargain for a new contract. In part because they were not all represented by the same counsel, the Employers reacted differently to the Union's bargaining request. FSI steadfastly refused to negotiate at all with the Union, announcing that it did not want to enter into a new agreement. The other three defendants—J&R Flooring, Inc., Freeman's Carpet Service, Inc., and FCS Flooring, Inc.—met with the Union but failed to reach an agreement. The Union then announced to all the Employers its intention to conduct a third-party card check in accordance with Article 4 of the agreement, prior to the expiration of the contract. All of the Employers refused to recog-

nize the Union as representing an employee majority, and they continue to maintain they have no duty to bargain.

With respect to FSI, the Union requested that the parties hold a card check on January 23, 2007. FSI responded that it was not available on that date. On January 30, 2007, the day before the agreement was set to expire, the Union faxed FSI a letter informing the company that the Union was scheduling the card check for noon that day at a local church, by Father Menchaca, a third party selected by the Union. No FSI representative appeared at the card check, and Menchaca conducted the check and reported that twenty of FSI's twenty-two employees had signed the authorization cards. In the card check, Menchaca compared the signatures on union authorization cards to the names of employees listed on the most recent remittance report submitted by FSI to the Union. Menchaca did not compare the employees' signatures on the cards to other signature samples, as required by the Board's decision in *Cascade General,* 303 NLRB 656, 671 (1991). Nor did he utilize the *Daniel-Steiny* formula, a formula that governs which construction employees are eligible to participate in card check procedures unless the parties stipulate not to use it. *See Signet Testing Laboratories*, 330 NLRB 1, 1 (1999). The formula provides that, in addition to employees on the payroll immediately preceding an election, employees who have worked a certain number of days in the two year period preceding an election are eligible to participate.

Following the card check, the Union's president, Jack Mallory, personally delivered copies of the card check results to FSI along with a follow-up email to FSI's vice president, Bryan Price, asking him to meet with Mallory the following day, January 31, 2007, for contract negotiations. Price indicated he could not meet at that time. On the 31st, the day of the collective bargaining agreement's expiration, the Union, in its purported capacity as the § 9(a) collective bargaining representative, sent a letter to FSI proposing available bargaining dates. FSI did not respond and maintains that it has

no duty to bargain with the Union following the expiration of the agreement.

The remaining three employers were all represented by the same attorney and all initially bargained with the Union to enter into a new contract. As of January 30, 2007, however, the parties were unable to reach an agreement. The parties met for a sixth session on January 31, at which time the Union announced its intention to conduct a card check. The attorney for the three employers objected to the card check on the grounds that the remittance reports that the Union intended to use were not current, his clients had not participated in the selection of the third-party neutral, and at least two employees had complained about the Union misinforming them of the purpose of the cards. The attorney threatened to walk out of the negotiations if the card check proceeded, and although the Union stated that it would proceed with the card check regardless of the attorney's presence, the employers and their attorney left.

A third party selected by the Union, Maria Castillo Couch, proceeded to conduct the card check. She compared the names on the cards with the names listed on the remittance reports and concluded that a majority of employees from each of the three employers agreed to representation by the Union. Couch then signed a card check certification to that effect. Couch, like Menchaca, did not verify the signatures or use the *Daniel-Steiny* formula.

The Union then sent a letter dated January 31, 2007, notifying the three employers of the results of the card check and suggesting dates for negotiations. Following the collective bargaining agreement's expiration, these employers have met with the Union but have refused to accept the card check results.

Thus, all four of the Employers refused to accept the card check and refused to recognize the Union as representing a

majority of employees so as to give rise to any duty to bargain under § 9(a) of the NLRA.

## PROCEDURAL BACKGROUND

In February 2007, the Union filed unfair labor practice charges with the NLRB against the four Employers. At that time, neither the Union nor the Employers had suggested pursuing grievance and arbitration procedures concerning the third-party card check. The Board's General Counsel brought charges against the Employers and the case proceeded to trial before an ALJ. The charge against the Employers was they had refused to comply with Article 4's card check provision and had thereby unlawfully refused to bargain. The ALJ found for the Employers, holding in essence that the Union could not rely on the card check results because it had not followed Article 4's further agreement to arbitrate disputes when the Union and the Employers failed to agree on the card check procedures. The Union's appeal of the ALJ's decision to the Board is still pending. After the ALJ issued her decision in September 2007, the Union filed this action in United States district court seeking an order compelling arbitration. The issues the Union identified for arbitration were "[w]hether the union established its status as the majority representative under § 9(a) pursuant to the terms of the contract? If so, what is the appropriate remedy?"

The district court granted the Employers' motions for summary judgment, denied the Union's motion to compel arbitration, and dismissed the case for lack of jurisdiction. The court found that the issue the Union proposed for arbitration was primarily representational and thus fell within the primary jurisdiction of the NLRB. The Union appeals the district court's dismissal to this court.

## ANALYSIS

The fundamental issue is whether the parties are required to arbitrate their disagreement over whether the Employers

have a duty to bargain. Whether the Employers have a duty to bargain in turn depends on whether the Union established it represented a majority of employees in accord with Article 4 of the agreement.

**[1]** Section 301 of the Labor Management Relations Act ("LMRA") creates a cause of action, enforceable in either state or federal court, for violation of collective bargaining agreements. 29 U.S.C. § 185(a); *Charles Dowd Box Co., Inc. v. Courtney*, 368 U.S. 502, 506 (1962); *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 449-51 (1957). The courts are to apply federal common law. *Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962); *Lincoln Mills*, 353 U.S. at 456-57. The threshold question for evaluating jurisdiction under Section 301 is whether there is an alleged breach of contract. *Carpenters Health & Welfare Trust Fund v. Tri Capital Corp.*, 25 F.3d 849, 858 (9th Cir. 1994) (overruled in part on other grounds). A contract for purposes of § 301 may be a collective bargaining agreement or another agreement "significant to the maintenance of labor peace" between a union and an employer. *Id.*

The Supreme Court has long supported arbitration of labor disputes involving disagreements over the interpretation of collective bargaining agreements, beginning with the famous *Steelworkers Trilogy*. *See United Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960). In the trilogy, the Supreme Court resolved several related issues concerning enforcement of arbitration clauses and awards, in each case finding in favor of arbitrability. In *American Manufacturing*, the Supreme Court held that when the parties have negotiated an arbitration clause, the function of the enforcing court is limited to determining "whether the party seeking arbitration is making a claim which on its face is governed by the contract." 363 U.S. at 568. In *Warrior & Gulf*, the Court considered the scope of arbitrability, and held

that all questions on which parties disagree come within the scope of arbitration unless specifically excluded, instructing that "[d]oubts should be resolved in favor of coverage." 363 U.S. at 581-83. Finally, in *Enterprise Wheel*, the Court contemplated judicial review of arbitral awards, and established a very deferential standard, holding that a reviewing court should not refuse to enforce an award merely because it would read the collective bargaining agreement differently than the arbitrator. 363 U.S. at 597-99. The pro-arbitration orientation first articulated in the *Steelworkers Trilogy* continues to be a foundational principle of our labor law. *See* John E. Higgins, Jr., *The Developing Labor Law* 1419-24 (5th ed. 2006).

**[2]** At the same time, the Supreme Court has long recognized that where a dispute involves allegations that an employer has committed an unfair labor practice, the Board exercises primary jurisdiction, and the federal courts "must defer to [its] exclusive competence." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959); *see also Commc'n Workers v. Beck*, 487 U.S. 735, 742 (1988)*; Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982) ("The Board is vested with primary jurisdiction to determine what is or is not an unfair labor practice."); *Garner v. Teamsters*, 346 U.S. 485, 490-91 (1953). The doctrine of primary jurisdiction stems from Congress's statutory delegation of duties to the Board, including the responsibility to interpret the NLRA in the first instance, and to investigate and adjudicate petitions for relief under the Act. *See Garner*, 346 U.S. at 490; *see also* 29 U.S.C. §§ 151-169.

**[3]** This Court has applied the doctrine of primary jurisdiction in declining to consider representational disputes that the NLRA commits to the Board's expertise. *See, e.g.*, *Local No. 3-193 Int'l Woodworkers of America v. Ketchikan Pulp Co.*, 611 F.2d 1295, 1298 (9th Cir. 1980) (finding designation of an exclusive bargaining agent and the definition of an appropriate bargaining unit within primary jurisdiction of the

Board); *United Ass'n of Journeymen v. Valley Eng'rs*, 975 F.2d 611, 614-15 (9th Cir. 1992) (declining to exercise jurisdiction under § 301 where issue of illegal doublebreasting already decided by the NLRB).

The Supreme Court has not had occasion to consider a § 301 action to enforce an agreement in which the parties have contracted for a means of resolving representational issues. This court, however, has decided such cases. Among the leading cases in the country are our decisions in *Hotel Employees, Restaurant Employees Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464 (9th Cir. 1992), and *Service Employees International Union, Local 399 v. St. Vincent Medical Center*, 344 F.3d 977 (9th Cir. 2003). *See The Developing Labor Law* at 1443; Laura J. Cooper, *Privatizing Labor Law: Neutrality/Card Check Agreements and the Role of the Arbitrator*, 83 Ind. L.J. 1589, 1596-97 (2008); George N. Davies, *Neutrality Agreements: Basic Principles of Enforcement and Available Remedies*, 16 Lab. Law. 215, 217 n.11 (2000).

In *Marriott*, a hotel chain contemplating construction of a major hotel in downtown San Francisco entered into a letter agreement with the union that, inter alia, bound the employer to accept the results of a card check and not to express any opinion to employees about whether they should choose the union as their representative. 961 F.2d at 1465-66. We held that those provisions were enforceable under § 301. *Id.* at 1468-70.

The union in *Marriott* had also argued that the district court should require the employer to provide access on its premises for the union to meet with employees, as well as names, addresses, and phone numbers of employees, even though the parties had no agreement as to these matters. *Id.* at 1469. Those issues therefore went to the general obligations of the employer during the organizing process. We held that such issues were within the primary jurisdiction of the Board:

> The doctrine of primary jurisdiction is a recognition of congressional intent to have matters of national labor policy decided in the first instance by the National Labor Relations Board. Congress directed the NLRB, not the courts, to determine an employer's obligations during the process of selecting a bargaining representative.

*Id.* (internal quotations and citations omitted).

**[4]** *Marriott* is significant because it established the principle that parties may contractually agree upon matters that would otherwise fall within the primary jurisdiction of the Board. *Id.* at 1468 ("[W]hile the *courts* may not resolve representational issues, the *parties* may resolve these issues contractually."); *see also* Cooper, 83 Ind. L.J. at 1597 ("Lower federal courts have applied the Supreme Court's broad interpretation of the scope of Section 301(a) specifically to hold that neutrality/card check agreements are enforceable in federal court.") (citing our decision in *Marriott* as well as *Hotel & Rest. Employees Union, Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 567 (2d Cir. 1993)).

We also considered contractual provisions dealing with organizational issues more than ten years later in *St. Vincent*. 344 F.3d at 977. In *St. Vincent*, the parties had negotiated detailed provisions aimed at preserving employer neutrality during an organizing campaign. *Id*. at 980. Both the union and the employer agreed not to coerce, intimidate, or threaten employees, and to "communicate only that which is factual." *Id.* The employer additionally agreed not to imply that employees would face less favorable wages or working conditions if they supported the union or to initiate one-on-one conversations with employees about unionization. *Id.* The agreement also set forth two options for determining majority representation: a secret-ballot election conducted by the parties and observed by a jointly selected Election Officer, or an

election conducted by the NLRB under the recognition rules established in the agreement. *Id.*

The parties in *St. Vincent* also agreed to a broad arbitration clause that encompassed disputes over the neutrality provisions. *Id.* When the Union lost the election, it filed a § 301 action claiming the employer had violated the neutrality provisions, and seeking arbitration, but not contesting the election result. *Id.* at 979, 986 n.7. The employer moved to dismiss on the ground that the issues were within the primary jurisdiction of the Board, and we were faced squarely with questions very similar to those in this case.

We framed the inquiry in *St. Vincent* as whether those issues were "primarily representational or primarily contractual," citing the test first squarely adopted by this Court in *Valley Engineers*. *Id.* at 983 (citing *Valley Engineers*, 975 F.2d at 613-14). Building upon *Marriott*, we first followed its holding that parties can contract about representational issues, noting the detailed provisions in the *St. Vincent* agreement. *Id.* at 984. We observed that because the Union was not challenging the election itself, there was nothing to trigger automatic Board jurisdiction. *Id.* at 984-86. We held in *St. Vincent* that nothing in the union's claim would require the district court or the arbitrator to "resolve any other representational issues not already resolved by the parties." *Id.* at 984. We thus concluded that the dispute in *St. Vincent* was fundamentally contractual in nature and ordered the parties to arbitration.

**[5]** Our inquiry in this case must be framed in the same manner as we framed the inquiry in *St. Vincent*, i.e., whether the dispute is fundamentally contractual or representational. The Union, in seeking arbitration, attempts to characterize the dispute at this point as contractual because it is about the card check provision in an agreement with a broad arbitration clause. The Employers say it is representational, looking at the issue that the Union actually seeks to arbitrate, which is

whether the Union represents an employee majority. The Employers have the stronger argument.

**[6]** Indeed, this particular dispute has never been about interpreting the actual language of the card check provision. When the Union originally filed unfair labor practice charges against the Employers, it charged that the Employers had refused to bargain after the Union had established majority status under the card check provision. The ALJ held that the Union had not complied with the card check provision and therefore could not establish majority status. What the Union seeks to arbitrate in this action is "[w]hether the union established its status as the majority representative under § 9(a) . . . ." The Union candidly acknowledged during oral argument that if and when the Board decides the representational issue it will trump any arbitration outcome.

**[7]** Accordingly, we must conclude that in this case the fundamental dispute between the parties is not contractual, but is representational. We reach that conclusion from our examination of the nature of the particular dispute within the context of the particular provisions bargained for by the parties. We do not accept the extreme argument of the Union that so long as there is any contractual provision touching upon representation, then all representational issues are arbitrable. This position is contrary to *St. Vincent*, which recognized that a dispute is not arbitrable where a party is seeking arbitration of representational issues on which the contract is silent. *See* 344 F.3d at 984. Nor do we accept the extreme position of FSI that so long as a dispute touches upon representational issues it can never go to arbitration. It is foreclosed by *Marriott*'s holding that contracts between unions and employers about representational issues are enforceable under § 301. *See* 961 F.2d at 1468.

**[8]** We hold that where the parties have contractually agreed only to use a card check to determine whether a union has established its § 9(a) majority status, the issue of whether

the union established its § 9(a) status remains primarily representational and within the NLRB's primary jurisdiction. The district court correctly ruled as a matter of law that the issues were representational and within the primary jurisdiction of the Board. The Union asked the district court to order arbitration of the issue of whether the Union had achieved majority status. The contract, however, only provides that the Employers agree to submit to a third-party card check. It does not specify any details about how the card check is supposed to occur, and the parties failed to agree on a mutually acceptable procedure, either through negotiation or arbitration. We do not see how an arbitrator could possibly resolve the dispute as framed by the Union without resorting to general principles derived from our national labor policy. The arbitrator would, for example, have to consider the validity of the Union's unilateral card check procedures under NLRB policy that presumptively applies the *Daniel-Steiny* eligibility formula. The Board is better suited to such a task.

**[9]** The Union suggests that the Federal Arbitration Act ("FAA") provides an alternative basis for ordering arbitration in this case in light of *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (reversing this Circuit's exclusion of all employment contracts from the reach of the FAA). We assume, without deciding, that the FAA applies to collective bargaining agreements in this Circuit after *Circuit City*. *See Poweragent, Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 n.1 (9th Cir. 2004) (recognizing unresolved issue). The FAA would provide a basis for arbitrating a contractual dispute, *see* 9 U.S.C. § 4, but this dispute is representational rather than contractual. It therefore remains under the Board's primary jurisdiction.

**[10]** Finally, both the Union and the Employers have requested attorneys' fees on appeal. The authority cited by the parties does not justify the award as a matter of course, and we do not find the Union's appeal to be frivolous. The requests for fees are therefore denied.

**AFFIRMED.**